UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| HONDA MANUFACTURING OF INDIANA LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 1:15-cv-00042-LJM-MPB |
| | ) |
| CUSTOM MACHINES, INC., et al. | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |
| | ) |
| CUSTOM MACHINES, INC., | ) |
| | ) |
| Counter Claimant, | ) |
| | ) |
| vs. | ) |
| | ) |
| HONDA MANUFACTURING OF INDIANA LLC, | ) |
| | ) |
| Counter Defendant. | ) |
| | ) |
| | ) |
| | ) |

## ORDER ON DEFENDANTS' COMBINED MOTION TO DISMISS

This cause is before the Court on Defendants Dean McClenathen ("McClenathen"), as well as Mecca Enterprises, LLC ("Mecca"), Maple Row Farms, LLC ("Maple Farms"), Maple Row Farms Trucking, LLC ("Maple Trucking"), Maple Row Farms Properties, LLC ("Maple Properties"), and Custom Integrators, LLC's ("Custom Integrators") (collectively "Entities") combined Motions to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2) ("Rule 12(b)(2)") for lack of personal jurisdiction (Dkt. 90); and 12(b)(6) ("Rule 12(b)(6)") for failure to state a claim upon which relief can be

1

granted (Dkt. 92).[1]  Plaintiff Honda Manufacturing of Indiana, LLC ("Honda"), filed its Amended Complaint for claims of breach of contract, trade secret misappropriation, conversion/theft, fraud (under both Indiana and Michigan law), as well as one combined count of piercing the corporate veil, alter ego doctrine, and enterprise theory, against McClenathen, the Entities, and Defendant/Counter Claimant Custom Machines, Inc. ("CMI"), which has submitted to personal jurisdiction. Dkt. 86.

For the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motions.

## I.      BACKGROUND

## A.  PROCEDURAL HISTORY

Honda filed its initial Complaint on December 1, 2014.  Dkt. 1.  It filed an Amended Complaint on April 27, 2016, and filed a Second Amended Complaint ("Amended Complaint") on September 13, 2016.  Dkts. 48, 86.

In response to Honda's complaint, the Defendants moved to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), and attached an Affidavit from McClenathen.  Dkt. 12, 13.  The Court granted Honda's Motion for Leave to Conduct Limited Jurisdictional Discovery, which included leave to serve a Subpoena Duces Tecum on Dean McClenathen and take his partial deposition limited to personal jurisdiction issues.  Dkt. 25.

Following this filing of Honda's Amended Complaint, the Defendants renewed their Motion to Dismiss for Lack of Personal Jurisdiction.  Dkt. 90.  Defendants also moved

---

[1] Defendants mistakenly state that the motion for failure to state a claim is made pursuant to Rule 12(b)(2). Dkt. 93 at 1.

under Rule 12(b)(6) to dismiss Count VII[2] of the Amended Complaint, which alleges a claim stated as "Piercing the Corporate Veil, Alter Ego Doctrine and Enterprise Theory" (hereinafter "Enterprise Theory").  Dkt. 93.

## B.  FACTUAL BACKGROUND

Honda is a limited liability company with its principal place of business in Greensburg, Indiana.  Dkt. 86, ¶ 1.  McClenathen is a resident of the State of Michigan and sole owner and shareholder of CMI, and sole owner and member of the Entities.  Dkt. 90, Dean McClenathen Affidavit ¶¶ 5, 8 (hereinafter "McClenathen Aff.").  CMI and the Entities have their principal place of business in Michigan.  Dkt. 86, ¶¶ 2-7.

In September 2013, Honda requested bids for interested contractors to work on its Buzz Point Automation Project ("Buzz Project"), which was to be completed at Honda's plant in Greensburg, Indiana.  *Id.* ¶ 14.  On September 10, 2013, McClenathen attended a pre-bid meeting in Greensburg, Indiana, to discuss project expectations and specifications with Honda representatives.  *Id.* ¶ 16.  On September 17, 2013, CMI submitted a quotation to perform the work on the Buzz Project, which Honda accepted.  *Id.* ¶¶ 17, 18.  Honda issued a purchase order ("Contract") to CMI, which represented the complete contract between Honda and CMI with respect to the Buzz Project.  *Id.* ¶ 18.  The Contract required, *inter alia*, that CMI perform construction on the Buzz Project to Honda's complete satisfaction and approval.  *Id.* ¶ 20a.  The Contract also made CMI responsible for the design and detail work on the Buzz Project.  *Id.* ¶ 20b.  It further stated that all Buzz Project drawings created by CMI were property owned by Honda and were

---

[2] The Court notes that there are two counts of the Amended Complaint labeled as Count VII.  Defendants' Motion is made as to the count as described, which is actually the eighth count contained in the Amended Complaint.

to be delivered by CMI to Honda for approval at various stages of the Buzz Project.  *Id.* ¶ 20f.  It also indicated that CMI's final Buzz Project drawings had to be submitted to Honda for approval prior to release of the final 10% of the order invoice. *Id.*  CMI was to provide Honda two complete sets of drawings as well as a digital copy.  *Id.* ¶ 20h.

Following the submission of CMI's bid, McClenathen traveled to Honda's plant once again to evaluate Honda's business operations and discuss the Buzz Project.  *Id.* ¶ 21.  Throughout the Buzz Project, Honda paid to CMI progress payments totaling $668,250.00 and retained $74,250.00 (the "Retainage").  *Id.* ¶ 22.  CMI failed to timely complete its work on the Buzz Project as required by the Contract. *Id.* ¶ 23.  After Honda encountered functionality issues with the Buzz Project, McClenathen, on behalf of CMI, traveled back to Honda's plant in Indiana to discuss the project.  *Id.* ¶ 24.

On or about April 5, 2014, CMI and McClenathen ceased working on the Buzz Project.  *Id.* ¶ 25.  On or about April 15, 2014, McClenathen or his agent filed the Articles of Organization for Custom Integrators with the Michigan Secretary of State.  *Id.* ¶ 26. CMI provided notice to its vendors – but not Honda – that it ceased conducting business sometime in May of 2014.  *Id.* ¶ 27; McClenathen Aff., ¶ 27.  From January 13, 2014, to September 2, 2014, McClenathen directed transfers of funds from CMI's checking and savings accounts to his own personal accounts and/or the accounts of Maple Farms in an amount totaling $157,718.51 ("Transfers").  *Id.* ¶ 28.

After CMI discontinued its work on the Buzz Project, Honda made multiple requests for CMI to comply with the Contract before it would remit the Retainage payment to CMI.  *Id.* ¶ 29.  CMI asserted that it must first receive payment of the Retainage in order to complete the work on the Buzz Project.  *Id.* ¶ 30.  McClenathen communicated with

4

Honda representatives and traveled to Honda's office in Indiana to discuss the payment of the Retainage.  *Id.* ¶ 31.  Honda alleges that McClenathen maintains possession of Honda's proprietary drawings, parts lists, and related materials that CMI owed to Honda pursuant to the Contract.  *Id.* ¶ 33; *compare* McClenathen Aff. ¶¶ 25-26.  McClenathen admitted to withholding this information from Honda as leverage to obtain the Retainage. *Id.* ¶ 32.

Sometime in July of 2014 – without providing notice to Honda – CMI vacated its formerly-leased premises and sold its tools and equipment at auction.  *Id.* ¶ 39; Dkt. 96-1, Dean McClenathen Deposition174:25-175:14 (hereinafter "McClenathen Dep."). McClenathen used the profits from the sale to pay off CMI's debt to its lender, which McClenathen had personally guaranteed.  McClenathen Dep. 174:25-175:14.  Included in the items sold at auction were CMI's computers, which contained digital auto CAD format drawings of the Buzz Project's electrical components as well as mechanical drawings.  *Id.* 151:15-24.  McClenathen knew that Honda's Buzz Project Materials ("Project Materials") were stored on CMI's computers.  *Id.* 145:13-23; 151:15-24. Nonetheless, McClenathen did nothing to protect or preserve the Project Materials on CMI's computers or its server.  *Id.* 139:20-141:9.  McClenathen claims that he did not read the contract, and therefore was unaware of his obligation to preserve the Project Materials.  *Id.* 142:8-25.

After CMI discontinued its business operations, McClenathen took all CMI materials, including those belonging to Honda, and placed them in storage at a facility rented by Maple Farms.  *Id.* 146:9-25; 148:4-18; 149:5-10; 173:6-174:5.  McClenathen claims he does not know what happened to CMI's financial records.  *Id.* 57:5-23.

McClenathen also claims to no longer possess CMI's corporate records or have any knowledge as to what might have happened to them. *Id.* 22:21-24:5; 56:7-25.

During his tenure as president of CMI, McClenathen created, owned, and operated numerous Michigan liability companies. *Id.* 65:14-67:20. McClenathen admitted that he did not maintain business records for all of his companies and that many of the companies are merely businesses "on paper." *Id.* 46:16-18; 66:21-25. Of the McClenathen owns and operates, Maple Farms is the only entity that has assets. *Id.* 46:19-22. McClenathen admitted to using "the farm account for me if I needed money to pay bills." *Id.* 126:8-11. He also admitted that he does not own a personal bank account and that in May 2014 his only account that he owned was solely set up for automatic payment of bills. *Id.* 125:05-126:7.

On April 14, 2014, McClenathen filed articles of organization with the Michigan Secretary of State to create Custom Integrators, a business that builds machine parts. *Id.* 41:7-10; 42:10-11; Dkt. 96-5. Maple Farms purchased all start-up equipment for Custom Integrators, which McClenathen valued at approximately $10,000.00. *Id.* 43:15-44:9. Custom Integrators uses the equipment that is owned by Maple Farms, and does not have to pay for the privilege to do so. *Id.* 44:12-45:2.

## II.    PERSONAL JURISDICTION

McClenathen and the Entities, each of which are Michigan citizens, argue that, pursuant to Rule 12(b)(2), Honda has failed to demonstrate that any of them has the "minimum contacts" required for this Court to exercise personal jurisdiction over them. Specifically, McClenathen and the Entities contend that they were not privy to the Contract from which this suit arises nor part of the performance therein.

In considering a motion advanced under Rule 12(b), the Court examines the sufficiency of the plaintiff's complaint as opposed to the merits of the lawsuit, and directs dismissal only if it appears to a certainty that the plaintiff can establish no basis for asserting personal jurisdiction.  Rule 12(b)(2) permits the dismissal of a claim for lack of jurisdiction over a person or entity.  In considering a Rule 12(b)(2) motion to dismiss, the Court reviews any affidavits and other documentary evidence that have been filed, as long as factual disputes are resolved in favor of the non-movant – in this case Honda. *See Gibson v. City of Chicago*, 910 F.2d 1510, 1520-21 (7th Cir. 1990).

A federal district court exercising diversity jurisdiction over the subject matter of an action has personal jurisdiction only if a court of the state in which it sits would have such jurisdiction.  *See RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1275 (7th Cir. 1997).  As McClenathen and the Entities have asserted a lack personal jurisdiction here, it then becomes Honda's burden to demonstrate the existence of jurisdiction. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782-83 (7th Cir. 2003).  Because no evidentiary hearing was held and the parties are solely relying on written materials, Honda need only make a *prima facie* showing of personal jurisdiction.  *Id.* at 782.

A determination of personal jurisdiction involves two steps.  First, the Court must determine whether the state's "long-arm jurisdiction" statute allows jurisdiction and, second, decide whether the exercise of jurisdiction comports with due process.  *See NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A.*, 28 F.3d 572, 580 (7th Cir. 1994).  Indiana's jurisdiction statute is Indiana Trial Rule 4.4(A).  Trial Rule 4.4(A) states as follows: "[A] court of this state may exercise jurisdiction on any basis not inconsistent with the Constitutions of this state or the United States."  Accordingly, this Court has personal

jurisdiction to the extent allowed by the Due Process Clause of the Fourteenth Amendment.

The Due Process Clause requires that a non-resident defendant have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"   *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).   Personal jurisdiction under Trial Rule 4.4(A) may be either general or specific. *See Alpha Tau Omega v. Pure Country, Inc.*, 185 F. Supp. 2d 951, 956 (S.D. Ind. 2002). General jurisdiction makes a non-resident defendant amenable to suit within a particular forum regardless of the subject matter of the suit, based on a defendant's continuous and systematic contacts with the forum.   *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16 (1984).   Honda does not assert general jurisdiction over any of the Defendants.

Specific jurisdiction makes a non-resident defendant amenable only to suits arising out of or related to its contacts with the particular forum.   *Id.* at 414.   Specific jurisdiction may be based on relatively modest contacts with the forum if they have a substantial connection to the plaintiff's action.   *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-76 (1985).   "[E]ach defendant's contacts with the forum State must be assessed individually."   *Purdue Research Found.*, 338 F.3d at 784.

For specific jurisdiction, due process requires that a non-resident defendant must have established his contacts with the forum state by purposefully availing himself of the privilege of conducting business there. *See Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 112 (1987).   "This 'purposeful availment' requirement ensures that a

defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King*, 471 U.S. at 475 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)).  In other words, the defendant's conduct and connection with the forum state should be such that he should reasonably anticipate being haled into court in that state.  *Id.* at 474.  To determine whether personal jurisdiction may be exercised, the Court engages in a three step analysis: (1) identify the contacts the defendant has with the forum; (2) analyze whether these contacts meet constitutional minimums and whether jurisdiction on the basis of these minimum contacts sufficiently comports with fairness and justice; and (3) determine whether the sufficient minimum contacts, if any, arise out of or are related to the causes of action involved in the suit. *GCIU-Employer Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1023 (7th Cir. 2009).

### A. McClenathen

McClenathen first argues that this Court may not exercise jurisdiction over him because, at all times relevant to this case, he acted solely in his capacity as president of CMI.  Dkt. 91 at 9-10.  McClenathen further asserts that he only retained the Project Materials on behalf of CMI in order to obtain the Retainage funds.  *Id.*  Moreover, McClenathen claims that he did not knowingly destroy any of the Project Materials and that he believed he had handed over all Project Materials to Honda.  *Id.*  McClenathen states that he did not read the Contract and therefore, could not have known exactly what Honda required pursuant to its terms.  *Id.*  Thus, McClenathen argues, that he solely acted as president of CMI in all dealings with Honda and therefore CMI's performance under the Contract may not be attributed to him in his individual capacity. *Id.* at 10.

Honda states that McClenathen exceeded his role as president of CMI and that he must answer for his personal actions with respect to the allegations of misappropriation, conversion, and theft of the Project Materials.  Dkt. 96 at 11.  Additionally, Honda asserts that McClenathen seeks shelter under the fiduciary shield doctrine, which Indiana does not recognize.  Honda further points out that McClenathen, who claims to have had a non-active role for the Buzz Project, repeatedly traveled to Indiana to discuss the Buzz Project and to negotiate the terms of the Contract's completion.  Moreover, Honda asserts that McClenathen, in his personal capacity, knowingly and intentionally exerted control over the Project Materials and sought to withhold the materials as leverage for payment of the Retainage.  *Id.*  Finally, Honda claims that McClenathen caused CMI to cease business operations, which essentially left it devoid of assets.  *Id.*

McClenathen maintains that, in spite of these facts, everything that he did, he did as president of CMI, and therefore Honda cannot show that McClenathen had minimum contacts with the state of Indiana.  The Court is not persuaded.  While it is true that "stock ownership in or affiliation with a corporation, without more, is not a sufficient minimum contact[,]"*Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000), McClenathen certainly had "more" when it came to his role in CMI's relationship with Honda.  Notwithstanding the fact that McClenathen did not sign the Contract, did not personally seek out the bid, and claims that he held an inactive role in the Buzz Project, at all times relevant McClenathen was the sole owner and shareholder of CMI.  McClenathen Aff. ¶ 9.  McClenathen negotiated and accepted the Buzz Project on CMI's behalf as he possessed ultimate authority over all of CMI's business decisions.  McClenathen Dep. 92:14-16; 94:11-16; 108:1-6; 109:4-7.  It was also

10

his sole decision to close CMI. *Id.* 111:9-112:9.  It was McClenathen who decided to alert all of his creditors, although not Honda, that CMI was ceasing business operations.  *Id.* 128:23-129:15.  It was McClenathen who chose to sell off CMI's assets, which included the Project Materials located in CMI computers.  *Id.* 121:21-122:2.  And finally, it was McClenathen who benefitted from the sale of CMI's assets, because he used the money from the sale to pay off CMI's debts made to his personal account, to Maple Farms, and to CMI's lender – which was a debt that he personally guaranteed.  *Id.* 111:9-23; 121:21-122:2; Dkt. 86 ¶¶ 31-35.   Despite McClenathen's assertion that he personally did not do any business with Honda, it is obvious that CMI's business served his own personal economic interests.  *See Hardin Roller Corp. v. Universal Mach., Inc.*, 236 F.3d 839, 842-43 (7th Cir. 2001) ("Yukich filed an affidavit denying that he *sold* parts in Wisconsin *in his own name*; the wording is clever but avoids the point that he regularly transacted business in Wisconsin to advance his personal economic interests. … [I]t would press corporate form beyond the breaking point to suppose that Yukich and Universal were different entities for the purpose of liability on contracts Yukich personally negotiated or performed, or business torts Yukich personally committed."); *see also Woodmar Coin Ctr., Inc. v. Owen*, 447 N.E.2d 618, 621 (Ind. Ct. App. 1983) (holding that defendant "purposefully availed himself of the benefits and responsibilities of doing business in this State by soliciting, negotiating and forming a contract with an Indiana resident.").

Moreover, McClenathen fails to recognize that, regardless of the hat that he wore in his dealings with CMI, this Court may still exercise jurisdiction over him personally. McClenathen maintains that all contacts with the state of Indiana were "taken in his capacity as president of CMI," and therefore, requires a finding that McClenathen cannot

11

be found to have minimal contacts in Indiana in his individual capacity.  Dkt. 101 at 6.

McClenathen essentially invites this Court to apply the fiduciary shield doctrine, which

"precludes a state from exercising jurisdiction over an individual sued in his or her

personal capacity if the only basis for jurisdiction is his or her contacts with the forum in

which he or she was acting solely as a fiduciary of a corporation." *Intermatic, Inc. v.*

*Taymac Corp.*, 815 F. Supp. 290, 293 (S.D. Ind. 1993). *See also Ryan v. Chayes v. Va.,*

*Inc.*, 553 N.E.2d 1237 (Ind. Ct. App. 1990).  This Court has specifically stated, however,

that this defense is not available in Indiana, because its application "would be contrary to

the well-established interpretation given to Indiana's long-arm statute" that reaches to the

limits of due process.  *Intermatic*, 815 F. Supp. at 296. *See also Health Mgmt. Prof'ls, Inc.*

*v. Diversified Bus. Enters., Inc.*, 882 F. Supp. 795, 799 (S.D. Ind. 1995); *Wine & Canvas*

*Dev., LLC v. Weisser*, 886 F. Supp. 2d 930, 941 (S.D. Ind. 2012).  Accordingly, this

argument fails.

Finally, because Honda has alleged fraudulent activity by McClenathen in the

Amended Complaint (Dkt. 86 ¶¶ 105-115), the exercise of jurisdiction over him personally

is proper.  Honda has alleged that McClenathen fraudulently transferred money to both

his personal account and that of Maple Farms.  Under Indiana law, "an officer is personally

liable for the torts in which [he] has participated or which [he] has authorized or directed."

*State Civil Rights Comm'n v. Cty. Line Park, Inc.*, 738 N.E.2d 1044, 1050 (Ind. 2000)

(citing, *inter alia*, *Gable v. Curtis*, 673 N.E.2d 805, 809 (Ind. Ct. App. 1996)).  "It is well-

settled that a corporate officer cannot escape liability for fraud by claiming that he acted

on behalf of the corporation when that corporate officer personally participated in the

fraud." *Gable*, 673 N.E.2d at 809. *See also DFS Secured Healthcare Receivables Tr. v.*

12

*Caregivers Great Lakes, Inc.*, 384 F.3d 338, 346 (7th Cir. 2004) ("Under Indiana state law, an officer or shareholder of a corporation can be held individually liable, without the need to pierce the corporate veil, if he personally participates in the fraud."). Accordingly, this Court is able to exercise personal jurisdiction over McClenathen for his allegedly fraudulent actions.

McClenathen personally availed himself of the privilege of conducting business in the state of Indiana, which in turn renders him subject to its jurisdiction. *See Burger King*, 471 U.S. at 473. McClenathen had a significant role in the formation of the Contract as well as the Buzz Project and should have reasonably anticipated being haled into court in Indiana as a result of his tortious behavior. *See Calder v. Jones*, 465 U.S. 783, 788-89 (1984). Thus, the Court concludes that McClenathen had sufficient minimum contacts with Indiana.

Having found that McClenathen meets the minimum contact threshold, the Court must then determine whether McClenathen has made a compelling case to show that litigating in Indiana would be unreasonable. *See Burger King*, 471 U.S. at 477. Asserting "personal jurisdiction will rarely be found unreasonable if 'minimum contacts' are found." *LinkAmerica Corp. v. Cox*, 857 N.E.2d 961, 967 (Ind. 2006). Reasonableness is determined by balancing five factors: (1) the burden on the defendant; (2) the forum State's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies. *Id.* at 968 (citing *Burger King*, 471 U.S. at 476-77).

McClenathen is the sole owner and shareholder of CMI, which has already submitted to personal jurisdiction in Indiana. His testimony with respect to the allegations against CMI would be crucial to any inquiry and would require his presence in Indiana, regardless of whether personal jurisdiction was exercised over McClenathen personally. McClenathen has failed to submit any evidence that personal jurisdiction over his person would violate traditional notions of fair play and substantial justice, particularly in light of the fact that his closely-held company, CMI, has submitted to such jurisdiction. Considering the substantial connection between Honda's claim and McClenathen's purposeful contacts in this forum, as well as the lack of prejudice to McClenathen to appear personally, it would not be unreasonable to require McClenathen to litigate this case in Indiana.

## B. Entities

The Entities argue that they were not privy to, nor involved in the performance of, the Contract or the Buzz Project, the Court agrees. Honda attempts to demonstrate that the Entities are "mere instrumentalities" of CMI. Dkt. 96 at 12. In support, Honda points to the fact that McClenathen was the sole owner and member of each of the Entities, as well as CMI. Honda then alludes to the fact that McClenathen loaned money to CMI and the Entities. All of these facts together, Honda claims, establishes that the Entities were a part of a "corporate web" under McClenathen's complete control. Therefore, Honda argues, CMI and McClenathen's jurisdictional contacts should be imputed to the Entities. *Id.* at 13.

In support of this proposition, Honda solely relies on the case *Reed v. Reid*. 980 N.E.2d 277 (Ind. 2012). In *Reid*, the court noted that "related corporations are presumed

14

to be independent entities." *Id.* at 304.  But, as *Reid* states, "[w]here corporate formalities are not observed, [] the presumption that related corporations are independent may be overcome." *Id.*  To do so requires evidence of one of the following: "(1) one corporation uses a related corporation in such a manner that an agency relationship can be perceived; (2) one corporation has greater control over a related corporation than is normally associated with common ownership and directorship; or (3) the related corporation is merely an empty shell." *Id.* at 304-05.  The *Reid* court found that a material issue of fact existed to preclude summary judgment with respect to whether or not the owner of multiple business properly observed corporate form or, in the alternative, utilized the "interrelationship to cause illegality, fraud, or injustice or to permit one economic liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise." *Id.* at 305 (citing *Oliver v. Pinnacle Homes, Inc.*, 769 N.E.2d 1188, 1192 (Ind. Ct. App. 2002)).

The Court begins its analysis by noting the general proposition that "each defendant's contacts with the forum State must be assessed individually." *Purdue Research Found.*, 338 F.3d at 784 (citations omitted).  Moreover, "the unilateral activity of parties other than the non-resident defendant cannot satisfy the requirement of the defendant's contacts with the forum state." *Id.* (citations omitted).

Honda's theory attempts to bundle all of the Entities into one, but fails to rebut the evidence submitted by the Entities to show that they acted independently in the manner in which they carried out their business.  Indeed, Honda is unable to establish how the Entities were used as "mere instrumentalities" of CMI.  All Entities were owned by McClenathen and run by him accordingly.  Nonetheless, the evidence demonstrates that

CMI had its own employees, separate from the other Entities.  More importantly, Honda has failed to allege any facts, or present any evidence, to establish a nexus between the Entities and the Contract or Buzz Project.  It follows that none of the Entities can be held liable for any of the allegations against McClenathen and CMI as set forth in the Amended Complaint.  Therefore, Honda's attempt to pierce the corporate veil to reach the other entities, falls short of overcoming the presumption that the Entities operated independently. See *LinkAmerica Corp.*, 857 N.E.2d at 968.  Honda is unable to (1) demonstrate that an agency relationship existed between CMI and the Entities, (2) that CMI exerted abnormal control over the Entities, or (3) that any of the Entities were an empty shell.  *Id.*  Accordingly, Honda's theory must fail.

Although Honda does not argue as much in its brief, it is worth noting that Honda alleges in the Amended Complaint that Maple Farms was indirectly involved with CMI. Dkt. 86 ¶¶ 105-115.  Honda submits that Maple Farms, as well as McClenathen personally, received fraudulent transfers from January 2014, through September 2014, in anticipation of this litigation.  Dkt 86 ¶¶ 113, 114.  Honda states that "[i]n the year that McClenathen caused CMI to cease business operations, during which time [Honda] was communicating with McClenathen for return of the Project Materials, McClenathen directed the transfer of $157,718.51 from the bank accounts of CMI to his personal accounts and/or the accounts of [Maple Farms]."  Dkt. 96 at 5.  Honda claims that these transfers were made at McClenathen's direction and with the intent to hinder, delay, or defraud Honda.  Dkt. 86 ¶¶ 113, 114.  Honda further alleges that the transfers violate the Uniform Fraudulent Transfer Acts of the States of Indiana (Ind. Code § 32-18-2-1, et seq.) and Michigan (Mich. Comp. Laws § 566).  In support of this assertion, Honda relies solely

16

on CMI's banking records, which date back to September 15, 2010, and demonstrates a series of transactions undertaken by CMI.

Honda notes that the jurisdictional analysis for cases involving intentional torts committed by non-residents, depends on whether the conduct bringing rise to the claims "was purposely directed at the forum state." *Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th Cir. Ill.). *See also Calder*, 465 U.S. at 790. The Court finds such an analysis unnecessary, however, because the transfers as described – without more – simply represent a series of intercompany loans dating back to 2010. It is well-established that mere conclusory statements will not suffice, and a "plaintiff must allege 'more than a sheer possibility that a defendant has acted unlawfully.'" *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court allowed Honda to depose McClenathen, yet Honda is unable to produce any testimony that would allow this Court to infer that these specific transfers were done with the purpose of avoiding potential obligations to Honda. Rather, as the Defendants point out, McClenathen's personal loans to CMI were documented, and the balance was maintained in CMI's accounting records. McClenathen Aff. ¶ 31. Similarly, the loans between Maple Farms and CMI, which was documented by a credit and security agreement, were maintained in the company's accounting records. *Id.* ¶ 40; Dkt. 90-1, Ex. D. Moreover, three of the allegedly fraudulent transfers to Maple Farms are specifically marked "Loan Payment[s]." Dkt. 96-6 at 4. While Honda takes umbrage with the fact that McClenathen conducted intercompany loans between himself, CMI, and Maple Farms, this alone is not enough to establish a *prima facie* case for a fraudulent transfer. On the record before the Court, the transfers at issue appear to satisfy a past

17

debt incurred to Maple Farms and McClenathen. *See* Ind. Code § 32-18-2-13 ("Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied.").   Honda bears the burden of demonstrating the existence of jurisdiction, *Purdue Research Found.*, 338 F.3d at 782, which it has failed to do.

### III.   **FAILURE TO STATE A CLAIM**

The Defendants moved to dismiss Honda's claim for Enterprise Theory pursuant to Rule 12(b)(6) for failure to state a claim.  Dkt. 93.  Rule 12(b)(6) permits the dismissal of a claim for failure to state a claim upon which relief can be granted in the pleadings.  A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Detailed factual allegations are not required, but a plaintiff's complaint may not merely state "an unadorned, the defendant-unlawfully-harmed-me accusation."   *Iqbal*, 556 U.S. at 678.  Rather, "a complaint must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face.'"   *Id.* (quoting *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged[,]" not when the plaintiff only raises a "sheer possibility that the defendant has acted unlawfully." *Id.* "[T]he height of the pleading requirement is relative to the circumstances[,]" *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009), and "[d]etermining the plausibility of a claim is a context-specific task that requires [the Court] to draw on [its] judicial experience and common sense." *Brown v. JP Morgan Chase Bank*, 334 Fed. Appx. 758, 759 (7th Cir. 2009).

Defendants argue that Michigan law applies to the claim under the internal affairs doctrine, which holds that the state in which a firm is incorporated is the source for the rules governing whether investors would be liable for its debts.  Dkt. 93 at 4 (citing *Chapel Ridge Invs., L.L.C. v. Petland Leaseholding Co., Inc.*, 2013 WL 6331095, *2 (N.D. Ind. 2013)).  Honda responds once again with its theory that all of McClenathen's businesses are run as one single business enterprise in order to defraud CMI's obligations to Honda. Dkt. 97 at 4-5.  In its prayer for relief under the Enterprise theory, Honda simply requests this Court find all of the Entities equally responsible for the allegedly tortious behavior of CMI and McClenathen.  As the Court has already stated in detail, *supra* pt. II. B., Honda has failed to establish how the Entities may be held liable for the actions of CMI or McClenathen.  Accordingly, the Enterprise Theory fails to state a claim for which relief is plausible and must be dismissed. *Iqbal*, 556 U.S. at 678.

## IV. CONCLUSION

For the reasons stated herein, the Court **GRANTS** Defendants' Combined Motion to Dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction with respect to Defendants Mecca, Maple Farms, Maple Trucking, Maple Properties, and Custom Integrators and **DENIES** the Motion to Dismiss with respect to Defendant McClenathen. Finally, the Court **GRANTS** Defendants' Motion to Dismiss Count VII for Enterprise Theory pursuant to Rule 12(b)(6) for failure to state a claim.

IT IS SO ORDERED this 7th day of December, 2016

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

19

Distribution:

Michael C. Cooley
ALLEN WELLMAN MCNEW
mcc@awmh.net

Kathleen I. Hart
RILEY BENNETT & EGLOFF LLP
khart@rbelaw.com

Katie R. Osborne
RILEY BENNETT & EGLOFF LLP
kosborne@rbelaw.com

Bryce H. Bennett, Jr.
RILEY BENNETT & EGLOFF LLP
bbennett@rbelaw.com