## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| HONDA MANUFACTURING OF INDIANA LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:15-cv-00042-TWP-MPB |
| | ) |
| CUSTOM MACHINES, INC., and DEAN McCLENATHEN. | ) |
| | ) |
| Defendants. | ) |
| ――――――――――――――――――――――― | ) |
| | ) |
| CUSTOM MACHINES, INC., | ) |
| | ) |
| Counter Claimant, | ) |
| | ) |
| v. | ) |
| | ) |
| HONDA MANUFACTURING OF INDIANA LLC, | ) |
| | ) |
| Counter Defendant. | ) |

## ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
## AND ENTRY REGARDING STATUS OF DEFENDANTS COUNTERCLAIM

This matter is before the Court on cross motions for summary judgment. The disputes in this matter surround Plaintiff Honda Manufacturing of Indiana LLC's ("Honda") claims against Defendants Custom Machines, Inc. ("CMI") and Dean McClenathen ("McClenathen") (collectively, "Defendants") for breach of contract. Honda alleges that Defendants failed to perform obligations under a contract to build an automated engineering process at its Greensburg, Indiana plant, breached confidentiality obligations, and misappropriated trade secrets. Defendants filed a Motion for Summary Judgment regarding the claims made against it by Honda. (Filing No. 126.) Honda has also filed a Motion for Partial Summary Judgment on the issue of liability in its

favor as to its breach of contract claims against CMI. ([Filing No. 131](#).) For the reasons set forth below, the Court **grants in part and denies in part** Defendants' Motion for Summary Judgment and **grants** Honda's Motion for Summary Judgment. The Court will also address the status of the Defendants' counterclaim. ([Filing No. 11 at 14](#).)

## I. <u>LEGAL STANDARD</u>

The purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only where there exists "no genuine issue as to any material facts and … the moving party is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted).

This notion applies equally where, as here, opposing parties each move for summary judgment in their favor pursuant to Rule 56. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir. 1996). Indeed, the existence of cross-motions for summary judgment does not necessarily mean that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., Inc. v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003). Rather, the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the court's] review of the record requires that [the court] construe all inferences in favor of the party against

whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Ins.*, 246 F.3d 975, 983 (7th Cir. 2001) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

## II.  BACKGROUND

Honda is a limited liability company with its principal place of business in Greensburg, Indiana. CMI is a Michigan corporation that maintained its corporate headquarters and principal place of business in Michigan.  (Filing No. 126-4 at 2.)  McClenathen was the president and owner of CMI at all times relevant to this action.  (Filing No. 126-4 at 2.)

### A.  Bid and Contract

On September 3, 2013, Honda issued a request for quotation for contractors to bid to perform work at Honda's plant, identified as the Buzz Point Automation Project ("the Buzz Project"). (Filing No. 126-4 at 3.)  McClenathen and CMI became aware of Honda's request for bids via CMI's project estimator, Mike Chase ("Chase").  (Filing No. 140-1 at 6.)  Prior to submitting CMI's bid, McClenathen traveled with Chase to Honda's facility in Greensburg, Indiana, for a pre-bid meeting with Honda representatives to discuss technical specifications for the Buzz Project. (Filing No. 140-1 at 9.)  McClenathen personally reviewed Honda's bid packet, including the written specifications for the Buzz Project, and stated that he understood the Buzz Project's purpose.  (Filing No. 140-1 at 9.)  McClenathen believed that CMI had the capacity to complete the Buzz Project and approved the submission of CMI's bid to Honda.  (Filing No. 140-7 at 2; Filing No. 140-9 at 10-12.)  On or about September 26, 2013, Honda accepted CMI's bid and signed a contract with CMI wherein CMI agreed to work on the Buzz Project in exchange for payment of $742,500.00 ("the Contract").  (Filing No. 140-7 at 2.)  McClenathen consulted with an attorney regarding the Contract and understood its requirements.  (Filing No. 140-1 at 7-9.)

Under the terms of the Contract, CMI agreed to provide the following services: (1) Buzz Project Management; (2) System Design; (3) Construction; (4) Installation; (5) Material Procurement; (6) System Debugging; (7) Commissioning; and (8) Associate Training. (Filing No. 140-3 at 3.) CMI also agreed to create and deliver drawings associated with the Buzz Project ("Project Drawings"), which included: (1) Electrical Diagrams; (2) Pneumatic Diagrams; (3) Detailed Component Drawings; (4) Assembly Drawings; (5) Layout Drawings; and (6) System Diagram. (Filing No. 140-3 at 10.)

CMI was also "responsible for updating and revising [the Project Drawings] due to any mechanical or electrical changes made to the equipment before final acceptance by [Honda]." (Filing No. 140-3 at 10.) CMI agreed to deliver to Honda, in AutoCAD format, "two complete sets of drawings with a digital copy as well." (Filing No. 140-3 at 10.) "The entire work product of [the] contract, including drawings, details, sketches, calculations, specifications, etc. [were] the property of Honda." (Filing No. 140-2 at 9.) CMI agreed to maintain, for a period of ten years, "an adequate inventory of all unique or specially manufactured parts to support and maintain the [Buzz Project,]" as well as a list maintaining all manufacturers used in connection with the Buzz Project. (Filing No. 140-5 at 28.) Before Honda would pay the final 10% of the amount owed on the Buzz Project ("Retainage"), CMI had to deliver the final Project Drawings to Honda. (Filing No. 140-2 at 8-9.) Finally, upon completion of CMI's work or inability to continue working on the Buzz Project, CMI agreed to immediately surrender all Buzz Project Materials to Honda. (Filing No. 140-4 at 1-2.)

CMI agreed that any and all Project Materials "[are] the proprietary and confidential information of Honda and may not be used, copied, reproduced, distributed or disclosed to any third party[.]" (Filing No. 86-1 at 4.)

**B.    CMI's Performance**

CMI commenced work on the Buzz Project in late September 2013.  (Filing No. 140-6 at 2.)  CMI employees traveled to Honda's plant in Greenburg, Indiana to work on the Buzz Project.  (Filing No. 140-7 at 2-3.)  McClenathen and CMI were aware that at least some of the electronic data could only be created and stored digitally.  (Filing No. 140-9 at 27.)  CMI's Buzz Project Manager, Ryan Mueller, maintained a three-ring binder that contained documents that related to the Buzz Project, but the binder did not contain electronic CAD drawings, digital representations of 3D images, because they could not be produced on paper.  (Filing No. 140-8 at 4.)

CMI's Controls Engineer, David Birdsall ("Birdsall"), used a laptop computer owned by CMI to perform work on the Buzz Project at Honda's facility.  (Filing No. 140-10 at 1-2.)  Birdsall used the CMI laptop to access, create, supplement, revise, amend, update and save the Project Drawings and materials.  *Id.*  Birdsall was the last CMI employee to work at Honda's facility and the last CMI employee to perform any work of any kind on the Buzz Project.  (Filing No. 140-10 at 2.)  In May 2014, Birdsall left Honda's facility for the last time, even though the Buzz Project was not complete.  (Filing No. 140-10 at 2.)  When Birdsall spoke to McClenathen after his last day at the Honda facility, McClenathen told him that "CMI was done working on the Buzz Project" and terminated his employment with CMI.  (Filing No. 140-10 at 2.)  After McClenathen terminated Birdsall's employment, he instructed Birdsall to return CMI's laptop, which he did.  (Filing No. 140-10 at 2.)  The laptop returned by Birdsall "contained the Project Materials, as well as the most recent Project Drawings."  (Filing No. 140-10 at 3.)

At the time CMI ceased working on the Buzz Project, Honda had issued CMI progress payments totaling $628,250.00.  (Filing No. 140-6 at 2.)  However, Honda withheld the Retainage,

pending, in part, upon receipt of the final Project Drawings from CMI.  ([Filing No. 140-6 at 2](#).)

Honda never received the final Project Drawings from CMI.  ([Filing No. 140-6 at 2](#).)

## C.  __Withholding of Project Drawings__

On May 5, 2014, Honda's Purchasing Department Manager Tim Kiste ("Kiste") emailed McClenathen regarding the status of the Buzz Project.  ([Filing No. 140-13](#).)  Kiste stated that he "ha[d] some concerns that CME [sic] did not meet all of the job scope requirements[,]" but that Honda would "release the last portion of [its] payment" on certain conditions, which included the return of the Project Drawings.  ([Filing No. 140-13 at 2-3](#).)  McClenathen knew the information Honda requested was "left at Custom Machines" and that additional information was saved on CMI's computers.[1]  ([Filing No. 140-1 at 11](#).)

On May 31, 2014, McClenathen caused CMI to cease business operations without providing notice to Honda.  ([Filing No. 140-1 at 11](#); [Filing No. 140-11 at 4-5](#).)  McClenathen retained CMI's corporate documents.  ([Filing No. 140-9 at 2](#).)

On May 15, 2014, McClenathen signed an Auction Marketing Agreement with Thompson Auction Company, which purchased CMI's computers that purportedly contained the Project Drawings.  ([Filing No. 140-14 at 11](#); [Filing No. 126-2 at 137](#).)[2]  McClenathen did not take any precautions to protect data stored on CMI's computers before allowing them to be sold.  ([Filing No. 126-2 at 168](#).)  McClenathen did not notify Honda that the Project Drawings would be deleted

---

[1] Specifically, McClenathen was asked whether he was aware of electronic Project Drawings on the CMI computers and claims that he did not "know what happened to it" and did not "think [he] had to give [Honda] everything that was necessary to build [the Buzz Project.]"  ([Filing No. 140-1 at 11](#).)  He then claims that he personally did not destroy the data, but admits that someone did.  ([Filing No. 140-1 at 11](#).)  The Court considers this sufficient indicia, at this stage in the proceedings, to infer that McClenathen knew that the CMI computers contained the Project Drawings in electronic format.

[2] Honda asserts that the computers were sold on July 16, 2014, but fails to cite to any evidence to prove that the sale occurred on this date.  ([Filing No. 139 at 10](#).)  Local Rule 56-1(e) requires parties to cite evidence that is "in the record or in an appendix to the brief."  Honda has failed to do so, and therefore, this assertion will be disregarded.

from the computers prior to their sale. (Filing No. 140-9 at 29.) However, all information stored on the computers, including data belonging to Honda under the Contract, was deleted from the computers prior to their sale. (Filing No. 126-2 at 139-40.)

On June 24, 2014, counsel for Honda sent a letter to CMI outlining various problems with the Buzz Project and demanded that CMI "provide all Buzz Project electrical and mechanical drawings, parts lists and manuals[.]" (Filing No. 140-12 at 2-3.) McClenathen refused to hand over the Project Drawings and admitted to "holding [them] hostage" until he was paid the Retainage. (Filing No. 126-2 at 132-33.)

On September 28, 2015, Honda finally received a copy of the Buzz Project binder via counsel for McClenathen and CMI. (Filing No. 140-6 at 2.) However, the binder did not include the final Project Drawings or any digital Project Materials. (Filing No. 140-6 at 2.)

**D.    Maple Row Farms**

In addition to CMI, McClenathen is the sole owner of a farming operation, Maple Row Farms. (Filing No. 126-4 at 3.) McClenathen withdrew money from his Maple Row Farms' accounts to pay for the registration fees required to keep his other companies, including CMI, in good standing. (Filing No. 126-2 at 36-37.) McClenathen no longer maintains a personal bank account and when he needs money for personal expenses, he withdraws money from Maple Row Farms' account. (Filing No. 126-4 at 125-26.)

**E.    Loan Agreements**

On December 23, 2009, McClenathen executed a series of agreements pursuant to which: (1) McClenathen obtained a loan from United Bank & Trust for the purpose of personally extending funds to CMI; (2) CMI and McClenathen entered into an agreement whereby McClenathen was authorized to advance funds to CMI for a limited period of time set by the

agreement ("McClenathen Loan"); (3) Maple Row Farms and CMI entered into an agreement whereby Maple Row Farms was authorized to advance funds to CMI for a limited period of time set by the agreement ("Maple Row Loan"); and (4) Maple Row Farms and CMI entered into an agreement whereby CMI was authorized to advance funds to Maple Row Farms for a limited period of time set by the agreement ("CMI Loan") (collectively, "the Loans"). (Filing No. 140-16 at 27-76.)

Each of the Loans were for different amounts: (1) the McClenathen Loan permitted McClenathen to advance $1,500,000.00; (2) the Maple Row Loan permitted Maple Row Farms to advance $500,000.00; and (3) the CMI Loan permitted CMI to advance $500,000.00. (Filing No. 140-16 at 27-28, 45-46, 53-62, 69-76.)

All three Loans contained a similar provision stating that "[t]he full outstanding balance of principal and accrued interest owed by Borrower to Bank pursuant to the Loan Documents shall be due and payable no later than the earlier of (i) Bank's demand therefore; or (ii) May 1, 2010." (Filing No. 140-16.)[3, 4]

F.     **CMI's Finances**

McClenathen, as President and sole owner of CMI, was authorized to withdraw money from CMI's bank accounts. (Filing No. 140-9 at 18-19.) Beginning around January 2014, CMI began having trouble paying its bills. (Filing No. 126-2 at 114.) From January 13, 2014 to September 2, 2014, McClenathen authorized withdrawals totaling $157,718.51 from CMI's

---

[3] The page numbers for each of the Loans is not legible, as the Bate stamp overlaps with another Bate stamp.

[4] Defendants claim, without any specific reference, that "Each of these loan agreements states that the *commitment to lend* only extends through May 1, 2010[,] and cites to all 17 pages of the Loans. (Filing No. 147 at 3.) Local Rule 56-1(e) states that a "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." Defendants have failed to properly support their assertion. Nonetheless, the Loans referenced by Defendants, as noted by Honda, specifically state that the outstanding balance of principal and accrued interest owed is due no later than May 1, 2010. (Filing No. 126-4 at 29, 53, 69.)

checking account and directed the amounts to be applied to loans incurred by Maple Row Farms. (Filing No. 141-1; Filing No. 126-4 at 3.)  The following transactions (collectively "Transfers") occurred:

1. On January 13, 2014, McClenathen authorized withdrawal of $20,500.00 cash;

2. On April 18, 2014, McClenathen authorized the withdrawal of $52,500.00 from the checking account of CMI and issued a loan payment to the bank in that amount on behalf of Maple Row Farms;

3. On June 11, 2014, McClenathen authorized the withdrawal of $10,000.00 from the checking account of CMI and issued a loan payment to the bank in that amount on behalf of Maple Row Farms;

4. On July 18, 2014, McClenathen authorized the withdrawal of $25,000.00 from the checking account of CMI and issued a loan payment to the bank in that amount on behalf of Maple Row Farms; and

5. On September 2, 2014, McClenathen authorized the withdrawal of $49,718.51 from the checking account of CMI and issued a loan payment to the bank in that amount on behalf of Maple Row Farms.

(Filing No. 141-1.)  McClenathen did not notify any of its creditors of the withdrawals made from CMI's checking account.  (Filing No. 140-9 at 19.)

### III. <u>DISCUSSION</u>

McClenathen and CMI seek summary judgment as to all of Honda's remaining claims, which include: Counts I (Replevin), II (Breach of Contract), III (Breach of Contract), IV (Breach of Contract), V (Conversion/Theft), VI (Trade Secret Misappropriation), and VII (Fraudulent

Transfers).  Honda has also filed for partial summary judgment as to its breach of contract claims against both CMI and McClenathen.

A.     **Breach of Contract**

Both parties have moved for summary judgment on each of Honda's breach of contract claims.  McClenathen asserts that he cannot be held individually liable for the alleged breach of CMI because he acted solely in his professional capacity as CMI's president and cannot be considered a party to the Contract.  Honda argues that there is no dispute that CMI breached the Contract.  The parties stipulated that the Contract would be governed by the law of Indiana, which is therefore applicable.  ([Filing No. 133-3 at 29](#).)  *See Wright-Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 132 (7th Cir. 1990) ("parties may expressly choose the applicable law through a contract.").

1.     **Individual Liability for McClenathen**

McClenathen asserts that he was not a party to the Contract and he cannot be held liable for CMI's actions.  ([Filing No. 127 at 9-12](#).)  Honda responds that a factual question exists as to whether McClenathen has so disregarded the corporate form that piercing the corporate veil is appropriate in this case.  ([Filing No. 139 at 17-19](#).)  Under Indiana law, "piercing the corporate veil is not a separate cause of action but rather a means of imposing liability for an underlying cause of action, such as breach of contract."[5]  *Michiana Dairy Processors, LLC v. All Star Beverage, Inc.*, 744 F. Supp. 2d 790, 808 (N.D. Ind. 2010).  Typically, Indiana "courts are reluctant

---

[5] The Court notes that the Second Amended Complaint, in error, lists Count VII twice. ([Filing No. 86 at 17](#) and 19.) The count for Piercing the Corporate Veil, Alter Ego Doctrine, and Enterprise Theory should actually be Count VIII, rather than Count VII. Defendants argue that the Court has already ruled on the issue of corporate liability in its December 7, 2016 Order, wherein the Court found that the count for Piercing the Corporate Veil, Alter Ego Doctrine, and Enterprise Theory of Honda's Amended Complaint was dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). ([Filing No. 106 at 18-19](#).)  However, this holding has no bearing on whether Honda may pierce the corporate veil to extend liability to McClenathen on Honda's breach of contract claims, which are still viable in this case. Accordingly, this argument is disregarded.

to disregard corporate identity; however, [they] may do so if it is necessary to prevent fraud or unfairness to third parties." *Konrad Motor and Welder Serv., Inc. v. Magnetech Indus. Servs., Inc.*, 973 N.E.2d at 1158, 1163 (Ind. Ct. App. 2012) (citation omitted). "When a court exercises its equitable power to pierce a corporate veil, it engages in a highly fact-sensitive inquiry." *Ziese & Sons Excavating, Inc. v. Boyer Constr. Corp.*, 965 N.E.2d 713, 719 (Ind. Ct. App. 2012) (quotation marks and citation omitted). The burden rests with the party seeking to "pierce the corporate veil" to prove "by a preponderance of the evidence 'that the corporate form was so ignored, controlled or manipulated that it was merely the instrumentality of another and that the misuse of the corporate form would constitute a fraud or promote injustice." *Escobedo v. BHM Health Assocs., Inc.*, 818 N.E.2d 930, 933 (Ind. 2004) (quoting *Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994)). In deciding whether to pierce the corporate veil, several guideposts have been identified: (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or directors; (4) use of the corporation to promote fraud, injustice, or illegal activity; (5) corporate payments of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; and (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form. *Id.* (citation omitted). This list is not exhaustive, nor do all factors need to be shown to support a decision to pierce the corporate veil. *See D.S.I. v. Natare Corp.*, 742 N.E. 2d 15, 26-27 (Ind. Ct. App. 2001).

Honda alleges that McClenathen has extensively demonstrated a disregard of the corporate form: (1) CMI was undercapitalized, requiring injection of funds from both McClenathen and Maple Row Farms; (2) McClenathen failed to maintain CMI's corporate records aside from accounting records; (3) McClenathen used CMI's money to pay expenses on his home and expenses for his other entities, including Maple Row Farms, and frequently transferred funds

between his personal account, as well as Maple Row Farms and CMI's accounts; (4) McClenathen used CMI to commit conversion/theft of Honda's physical and digital property, which resulted in the destruction of Honda's digital property; (5) McClenathen admitted to holding Honda's property "hostage" in order to receive the Retainage; and (6) the McClenathen, CMI, and Maple Row Loans did not observe corporate formalities as they continued past the maturity date of May 1, 2010.[6]  ([Filing No. 139 at 18-19](#).)

Taking all of these facts in favor of Honda, a jury could find that McClenathen ignored the corporate form to the extent that it constitutes a fraud against Honda.  McClenathen was the only remaining member of CMI at the time he took possession of CMI's property, *i.e.* the computers and the binder, and admittedly held them "hostage" to receive the Retainage.  When he did not receive the Retainage, he sold the computers without providing notice to Honda, which prevented Honda from receiving the electronic Project Drawings owed to it under the Contract.  Finally, the intermingling of funds pursuant to the Loans allowed for McClenathen to deplete CMI's funds and bolster his own and Maple Row Farms' accounts.  While Defendants contend that the Loans were simply inter-company loans, the fact that none of the lenders on the Loans collected pursuant to the terms set forth could be seen as a failure to observe the corporate form.  Sufficient facts exist to allow a jury to infer that McClenathen's disregard of the corporate form could render him liable under Honda's breach of contract claim.  Therefore, Defendants' Motion for Summary Judgment on Honda's Breach of Contract claims is hereby **denied**.

---

[6] It should be noted that Honda did not cite to the actual maturity date in its Response to Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(2).  ([Filing No. 96](#).)  Honda merely cited to various withdrawal and loan payment records indicating a series of transfers between McClenathen, CMI, and Maple Row Farms, totaling $157,718.51.  (*See* [Filing No. 96 at 5](#), citing ([Filing No. 96-6 at 4](#).))  Although Honda mentioned that the loan "agreements matured in 2010," Honda did not cite to the specific language of the loan agreements to demonstrate that the loans were past due and that neither McClenathen, nor Maple Row Farms, collected the amounts owed pursuant to the agreements.  *See* ([Filing No. 96 at 12](#).)

2.      **CMI Breach of Contract**

Honda alleges there is no dispute that CMI breached the Contract because it did not receive the final Project Drawings after CMI ceased working on the Buzz Project and because all electronic drawings were subsequently deleted.  (Filing No. 132 at 12.)  Thus, Honda argues that there are no disputed facts that preclude summary judgment against CMI for its breach of the Contract.

CMI concedes that it did not deliver the drawings as required pursuant to the Contract. Nonetheless, CMI asserts that genuine issues of fact exists as to: (1) whether Honda's May 5, 2014 email modified the terms of Contract; (2) whether Honda received one copy, in some form, of all the Project Drawings created by CMI; (3) whether Honda's receipt of one copy of the Project Drawings substantially met CMI's obligations set forth in the May 5, 2014 email; and (4) whether CMI is entitled to receive all or a portion of the Retainage.  (Filing No. 138 at 6.)

"Parties to a contract may mutually modify their contractual undertakings, and it is not always necessary to prove a written or oral modification of a contract because modification of a contract can be implied from the conduct of the parties."  *City of Indianapolis v. Twin Lakes Enters.*, 568 N.E.2d 1073, 1084 (Ind. Ct. App. 1991).  The modification of a contract "requires all of the requisite elements of a contract."  *Id*.   "An offer, acceptance, consideration, and a manifestation of mutual assent establish the existence of a contract."  *Ind. Dep't of Corr. v. Swanson Servs. Corp.*, 820 N.E.2d 733, 737 (Ind. Ct. App. 2005) (quotation and citation omitted). A valid contract modification does not occur when a party "only agreed to do what it already had an obligation to do under the existing [contract.]"  *AM Gen. LLC v. Amour*, 46 N.E.3d 436, 443 (Ind. 2015).

Regarding Defendants claim of modification of the Contract, CMI fails to differentiate how the May 5, 2014 email constituted anything more than a reminder of its continuing obligations

under the Contract.  CMI owed all the Buzz Project Materials to Honda, and Honda was simply requesting that CMI perform as agreed under the Contract.  Moreover, in the email, Honda requested "all supporting documentation" from CMI, which included "Updated Electrical Drawings," to which CMI responded "[n]o problem."  (Filing No. 140-14 at 3.)  CMI does not dispute that it did not turn over the electric drawings; therefore, even if the email could be viewed as a modification, CMI failed to provide consideration establishing a modification to the original Contract.  *See Amour*, 46 N.E.3d at 443.

CMI further argues, without citing any evidence, that "Mueller testified that modifications to the Buzz Project drawings and programming information were uploaded to Honda's computers, located in Honda's facility[,]" which in turn supports an inference that the updated drawings and programming created by Birdsall were uploaded to Honda's computers.  (Filing No. 138 at 8-9.)  CMI argues that, based on this unsubstantiated presumption, Honda has at least one copy of all the Project Drawings created by CMI, thereby creating an issue as to whether the breach by CMI was material.  (Filing No. 138 at 9-10.)  Once again, however, CMI fails to establish this fact by citing to the record, in contravention of Local Rule 56-1(e).  Even assuming all facts in CMI's favor, the undisputed evidence demonstrates that Birdsall was the last CMI employee working at Honda's plant and that the Buzz Project was not complete when he left Honda's plant for the last time.  (Filing No. 133-9 at 2.)  Moreover, Birdsall testified that his CMI laptop, which contained the most recent Project Drawings, "were not complete or final."  (Filing No. 133-9 at 3.)  CMI could not have complied with the terms of the Contract, which required them to hand over the final Project Drawings to Honda.  Thus, Honda's Motion for Summary Judgment for Breach of Contract is hereby **granted.**

**B.**    **Replevin and Conversion/Theft Preemption**

Defendants assert that Honda's claims for replevin (Count I) and conversion/theft (Count VI) are preempted by the Indiana Uniform Trade Secret Act ("IUTSA").  (Filing No. 127 at 12.) The IUTSA preempts "all conflicting law of this state pertaining to the misappropriation of trade secrets, except contract law and criminal law."  Ind. Code § 24-2-3-1(c).  The IUTSA "was designed to cover 'duties imposed by law,' as opposed to duties that arise from agreements[.]" *Infinity Prod., Inc. v. Quandt*, 810 N.E.2d 1028, 1033 (Ind. 2004).  Under Indiana law, the IUTSA "'abolishes all … causes of action for theft or misuse of confidential, proprietary, or otherwise secret information falling short of trade secret status (*e.g.* idea misappropriation, information piracy, theft o[f] commercial information, etc.).'"  *HDNet LLC v. North Am. Boxing Council*, 972 N.E.2d 920, 924-25 (Ind. Ct. App. 2012), *trans. denied* 980 N.E.2d 322 (quoting *BlueEarth Biofuels, LLC v. Hawaiian Elec. Co.*, 235 P.3d 310, 321 (Haw. 2010)).

Honda's claims for replevin and conversion/theft allege that CMI and McClenathen wrongfully exerted control over Honda's property, which included both the hard and electronic versions of the Project Drawings.  (Filing No. 86 at 8-10; 16-17.)  In its Amended Complaint, Honda not only concedes that the Project Drawings sought in each of these claims constitutes a "trade secret" under the IUTSA, but it also asserts a separate action under the IUTSA for the same property.  (Filing No. 86 at 14-16.)  As the *HDNet* court concluded, the IUTSA preempts common law claims based on misappropriation of trade secrets, and if said information is not considered a trade secret, "the plaintiff has no legal interest upon which to base his or her claim."  *HDNet*, LLC, 972 N.E.2d at 925 (quoting *Hauck Mfg. v. Astec Indus.*, 375 F. Supp. 2d 649, 657 (E.D. Tenn. 2004)).

Honda's only response is that *HDNet* involved intangible intellectual property and is distinguishable from the Project Drawings allegedly misappropriated by Defendants.  ([Filing No. 139 at 23](); 27.)  Honda fails to provide any legal authority to establish how the IUTSA is only applicable to tangible trade secrets and its argument is therefore waived.  *See Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) (citation omitted) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.").  Moreover, at least some of the Project Drawings were electrical drawings and therefore intangible.  Finally, the Defendants "'need not possess this information in a tangible form … for this type of information to qualify as trade secrets under Indiana law.'"  *Bodemer v. Swanel Beverage, Inc.*, 884 F. Supp. 2d 717, 728 (N.D. Ind. 2012) (quoting *Bridgestone/Firestone, Inc. v. Lockhart*, 5 F. Supp. 2d 667, 681 (S.D. Ind. 1998)).  *See also, Dick Corp. v. SNC–Lavalin Constructors, Inc.,* No. 04 C 1043,  2004 WL 2967556 (N.D. Ill. Nov. 24, 2004) ("in cases where the value of a claim stems primarily from the ideas contained within items rather than their tangible forms, the [Illinois Trade Secrets Act] preempts the claim."); *AutoMed Techs., Inc. v. Eller,* 160 F.Supp.2d 915, 922 (N.D. Ill. 2001) (although software and design plans "exist in tangible form, their value is primarily from the information contained within that form" and thus the conversion claim based upon them was preempted by the Illinois Trade Secrets Act).

Honda's conversion/theft and replevin claims are based in the misuse and retrieval of the Project Drawings, which, as Honda concedes, constitute trade secrets.  Accordingly, Honda's replevin and conversion/theft claims are preempted by the IUTSA and Counts I and VI are dismissed.[7]

---

[7] It should be noted that Honda is not without a remedy for Defendants' misappropriation of the Project Materials. The IUTSA "does not preempt claims for misappropriation of information or ideas that are protected by contract." *HDNet LLC*, 972 N.E.2d at 925; *see also* Ind. Code § 24-2-3-1(c).  Honda has asserted three separate counts for breach of contract, as well as one count under the IUTSA.  ([Filing No. 86 at 10-16]().)

C.      **Indiana Uniform Trade Secret Act**

Defendants also seek summary judgment as to Honda's claim under the IUTSA on two separate grounds (Count V).  First, Defendants allege that McClenathen solely acted in his capacity as president of CMI, which negates any liability for any alleged misappropriation of trade secrets is inappropriate against him personally.  (Filing No. 127 at 19-20.)  Defendants essentially make the same argument relating to McClenathen's potential liability for breach of contract, which has already been addressed by the Court.  *See supra* pt. III, A, 1.  Because Defendants offer no new legal theories as to whether McClenathen can be held personally liable for the allegations under the IUTSA, the Court incorporates its analysis as set forth above.  A jury could find that McClenathen exceeded his role as president of CMI, which could render him liable for the alleged misappropriation.

Defendants also claim that neither CMI nor McClenathen misappropriated Honda's trade secrets.  (Filing No. 127 at 20-21.)  Defendants assert that "[t]here is no evidence that CMI or McClenathen disclosed the contents of the Project Materials to any person other than to CMI's employees as necessary to complete the Buzz Project, as contemplated by the Contract."  (Filing No. 127 at 21.)  Defendants' reading of what comprises a "misappropriation" is narrower than the IUTSA defines it.  The IUTSA defines misappropriation, in part, as follows:

> (1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person who: … (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was: … (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use[.]"

Ind. Code § 24-2-3-2.

Accepting all facts in favor of Honda, a jury could find that each of these definitions is applicable to the Defendants' actions in this case.  First, as Defendants concede, the Project

Drawings were at all times the property of Honda and, upon demand by Honda, Defendants had a

duty under the Contract to return all Project Drawings.  Rather than immediately handing over the

Project Drawings as required, Defendants admittedly held them "hostage" in order to receive the

Retainage.  (Filing No. 126-2 at 132-33.)  Failure to turn over the Project Drawings as required by

the Contract resulted in Defendants improperly possessing the Project Drawings.  *See, e.g., N.*

*Elec. Co., Inc. v. Torma*, 819 N.E.2d 417, 429 (Ind. Ct. App. 2004) ("It is clear that by his refusal

to return the data compilation, which is Northern Electric's property and which Torma had

compiled on the company's behalf, his possession of the data became unauthorized and his

acquisition improper.").  Furthermore, it is undisputed that Defendants agreed that all Buzz Project

Drawings were the "proprietary and confidential information of Honda," (Filing No. 86-1 at 4),

thereby creating a "duty to maintain its secrecy or limit its use[.]"  Ind. Code § 24-2-3-2.  Thus, a

jury could find that Defendants, who had a duty to maintain the confidentiality of the Buzz Project,

misappropriated Honda's Buzz Project Drawings by auctioning off the computers containing the

trade secrets.

**D.**      **Michigan Uniform Fraudulent Transfer Act**[8]

Honda alleges that the Transfers executed between CMI, McClenathen, and Maple Row

Farms constituted fraudulent transfers that should be avoided.  (Filing No. 86 at 17-18.)  The

Michigan Uniform Fraudulent Transfer Act ("MUFTA") defines two types of fraudulent transfers.

"The first encompasses transfers made 'with actual intent to hinder, delay, or defraud a creditor

and applies to transfers made either before or after the creditor's claim arose.[']"  *Dillard v.*

*Schlussel*, 865 N.W.2d 648, 656 (Mich. Ct. App. 2014) (quoting Mich. Comp. Laws §

---

[8] Honda has alleged that Defendants violated Uniform Transfer Acts of both Michigan and Indiana.  (Filing No. 86 at 17-18.)  Honda nor Defendants provided a choice of law analysis and examined the facts under the laws of each state. (Filing No. 127 at 22-34; Filing No. 139 at 27-37.)  Because all transfers occurred in Michigan between Michigan residents, the Court finds it appropriate to apply the Michigan Uniform Transfer Act to the facts of this case.

566.34(a)(1)).  The second type is constructive fraud, which "deems certain transactions fraudulent regardless of the creditor's ability to prove the debtor's actual intent."  *Id*.

Considering all facts in favor of Honda, a jury could conclude that the Transfers between McClenathen, CMI, and Maple Row Farms constituted actual fraud under the MUFTA.  Therefore, the Court need not address the parties' constructive fraud arguments.

### 1. <u>Actual Fraud</u>

Fraudulent intent may be determined by considering whether one or more of the following badges of fraud exists:

1. The transfer or obligation was to an insider;

2. The debtor retained possession or control of the property transferred after the transfer;

3. The transfer or obligation was disclosed or concealed;

4. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

5. The transfer was of substantially all of the debtor's assets;

6. The debtor absconded;

7. The debtor removed or concealed assets;

8. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

9. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

10. The transfer occurred shortly before or shortly after a substantial debt was incurred; or

11. The debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor;

Mich. Comp. Law § 566.34(2). "A creditor making a claim for relief under [§ 566.34(a)] has the burden of proving the elements of the claim for relief by a preponderance of the evidence." Mich. Comp. Law § 566.34(3).

Defendants assert that there is no proof that the Transfers were not in good faith because they were made pursuant to valid agreements between the parties. But as discussed above, *supra* pt. III, A, 1, a jury could certainly find that the Transfers were done with an intent to defraud Honda of money that it was owed (particularly after destruction of the Buzz Project Drawings that CMI owed Honda under the Contract). Indeed, numerous badges of fraud as set forth above are present in this case. McClenathen, as the sole owner of Maple Row Farms and CMI, authorized each of the Transfers. The Transfers resulted in the withdrawal of $157,718.51 of cash payments to either McClenathen or Maple Row Farms for antecedent debts. The Transfers began four months before CMI's closure and concluded with the final Transfer on September 2, 2014, over six months past Honda's initial demand for the final Buzz Project Drawings. The Transfers essentially left CMI without any funds. Moreover, the Loans had since matured and all monies owed under them should have been paid four years prior. Finally, all of the Transfers occurred without notice to Honda.

Defendants focus on the time of the Transfers and seemingly ask the Court to determine which Transfers are fraudulent and which are not, based on CMI's and McClenathen's intent at the time the Transfers were made. (Filing No. 127 at 32-34.) Such an analysis is not appropriate for the Court on summary judgment. In order to recover damages under the MUFTA, Honda will have to prove to the finder of fact by a preponderance of the evidence how each of the Transfers exhibited fraudulent intentions. *See* Mich. Comp. Law § 566.34(3).

Genuine issues of material fact exist relating to the Transfers between McClenathen, CMI, and Maple Row Farms, and therefore summary, judgment is **denied** as to Honda's MUFTA claims.

## IV.  DEFENDANT'S COUNTERCLAIM

In its Conclusion, the Court ordinarily determines the claims that remain pending for trial. The Court notes that CMI's counterclaim, was not addressed by the parties on summary judgment. CMI asserted a counterclaim for breach of contract against Honda in its Answer to Honda's original Complaint.  (Filing No. 11.)  However, CMI did not reassert the counterclaim in its Answer to the Amended Complaint (Filing No. 63), or its Answer to the operative Second Amended Complaint. (Filing No. 95.)   Some courts have found that failure to replead a counterclaim constitutes a waiver of the claim while others undergo an equitable analysis to determine whether the claim was diligently pursued by the defendant.  *Compare Johnson v. Berry*, 228 F. Supp. 2d 1071, 1079 (E.D. Mo. 2002) ("as the language of Rule 13(a) and (b) makes clear, a counterclaim is part of the responsive pleading.  By failing to plead in response to the first amended complaint, and therein to replead his counterclaim, Berry abandoned his counterclaim, which effectively dropped from the case.") *with Davis v. White*, 794 F.3d 1008, 1016-17 (8th Cir. 2015) ("Where … plaintiff is given sufficient notice that defendant is continuing to pursue a compulsory counterclaim, and plaintiff would not be unfairly prejudiced if the counterclaim proceeds, an inflexible rule that counterclaims are always abandoned if not repleaded would not serve the interests of justice.").

Though the record is silent as to whether Defendants have diligently pursued their compulsory counterclaim, the interests of justice are not served by allowing the counterclaim to proceed. The undisputed facts demonstrate that the counterclaim fails on its face.  CMI's counterclaim for breach of contract is summed up in two sentences: (1) "CMI has completed all

[of] its obligations under the terms of the Contract" and (2) "[b]y failing to pay the Retainage, Honda has breached the Contract." (Filing No. 11 at 14.) The undisputed facts demonstrate that CMI failed to submit the final Project Drawings, which meant that it did not perform all of its obligations under the Contract and therefore was not owed the Retainage.

Federal Rule of Civil Procedure 13(a)(1) requires that a compulsory counterclaim be stated in "a pleading." Defendants replead their Affirmative Defenses, however, failed to replead their counterclaim in their Answer to the operative Second Amended Complaint, accordingly, the Court determines that CMI has abandoned their counterclaim for breach of contract and the counterclaim is **dismissed without prejudice.** Defendants are given ten (10) days from the filing of this Entry to request leave to replead their counterclaim if they believe the legal deficiencies can be cured.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Filing No. 126) is **GRANTED in part** and **DENIED in part** and Honda's Motion for Partial Summary Judgment (Filing No. 131) is **GRANTED.** CMI and McClenathan are granted summary judgment on Honda's claims for Replevin (Count I) and Conversion/Theft (Count VI); and those counts are dismissed. Honda is granted summary judgment on its breach of contract claims against CMI (Counts II and III). In addition, CMI and McCleanathan's Counterclaim is **DISMISSED without prejudice.** The claims that remain for trial on January 8, 2018 are Honda's claims for breach of contract damages (Count IV), Trade Secret Misappropriation (Count V) and Violation of Michigan's Uniform Fraudulent Act (Count VII).

SO ORDERED.

Date:  11/1/2017

_Tanya Walton Pratt_
_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Bryce H. Bennett, Jr.
RILEY BENNETT & EGLOFF LLP
bbennett@rbelaw.com

Katie R. Osborne
RILEY BENNETT & EGLOFF LLP
kosborne@rbelaw.com

Michael C. Cooley
ALLEN WELLMAN McNEW
mcc@awmh.net